## PENCE v. LANGDON.

1. The jury should not be instructed to find for the defendant, unless the evidence is such as to leave no doubt that it is their duty to return a verdict in his favor.
2. The notice of the rescission of a contract is not rendered void by reason of the fact that it .was given in Nevada on Sunday.
3. The vendee of stock in a company, who, on the ground of fraud, rescinded his contract of purchase, is not bound to receive the stock certificate left on deposit for him by the vendor, and tender it to the latter before bringing his action for the purchase-money.
4. The court submitted to the jury to determine whether from certain letters and telegrams, when considered in connection with the other evidence in the case, the defendant undertook to act as the agent of the plaintiff in the purchase of stock from other parties. The jury found, and the letters clearly showed, that he did undertake so to act. *Held,* that the omission of the court to construe the written evidence, if erroneous, affords him no just cause of complaint.
5. Where the plaintiff's knowledge of the fraud and his neglect to promptly rescind the contract are relied on to defeat the action, the burden of proving the fact of such knowledge and the time when it was acquired rests upon the defendant.

ERROR to the Circuit Court of the United States for the District of Minnesota.

The facts are stated in the opinion of the court.

*Mr. C. K. Davis* for the plaintiff in error.

*Mr. William Lochren, contra.*

MR. JUSTICE SWAYNE delivered the opinion of the court.

A brief statement of the facts disclosed in the record will be sufficient for the purposes of this opinion, and a few remarks will suffice to dispose of the case.

Langdon lived in Minnesota. Pence lived in California, and was engaged in mining operations. On the 10th of December, 1874, Langdon, by a letter of that date, advised Pence that he had seen Watson, and inquired about their mining interests. He concluded by saying: "If any thing can be done that will be satisfactory to all parties, let me know." Pence replied by letter of the 17th of that month. Speaking of the mine in which he and Watson were concerned, he said, amongst other

things: "There is an eighth, that is, 7,500 shares, that can be bought if taken at once, at the same I paid and the same Watson paid, after looking and prospecting for five weeks." "The price is . . . $8,368.75, gold." . . . "Should you conclude to buy, you must telegraph me here on receipt of this letter. You can pay," &c. "This will put you on the ground-floor with us, or better than I am, as I have spent about $600 to find this mine, prospect it, and have title looked up, &c. Our title is O. K." Langdon bought and paid the price demanded. On the 28th of January, 1875, Pence addressed Langdon another letter from San Francisco, in which he said: "There have been not less than ½ doz. after the 7,500 *shares of stock I sold you*, and all were astonished to find themselves too late; and still more astonished when I told them there was no more to be had at present, as we have the controlling interest, and propose to run the mine as we think best." . . . "The stock I have deposited in the Nat. Gold Bank and Trust Co. of this city." . . . "I would like to have you come out after the roads get good and weather pleasant in the spring." This letter enclosed a bill commencing "Hon. R. B. Langdon, Mina., to J. W. Pence, dr." The stock was charged and the amount paid was credited. No person other than Pence was named as the seller. Linton and Shepherd were interested with Langdon in the purchase. On the 20th of June, 1875, all of them visited the mine with Pence. They claimed then to have learned for the first time that Pence had sold them his own stock, and to have learned also that the stock was worth much less than they had paid for it. They arrived on Saturday, and on the next day notified Pence that they rescinded the contract, and required what they had paid to be refunded. Shepherd and Linton transferred their interest to Langdon, and he thereupon brought this suit. The code of Minnesota authorized it to be in his name.

Upon the trial in the court below six exceptions were taken by Pence. Two of them were to the admission of testimony. Both of them are so clearly without merit, that we deem it unnecessary to say more about them. He also excepted to the refusal of the court to direct the jury to find a verdict in his favor.

Such direction can be properly given only when the state of the evidence is such as to leave no room for doubt that it is the duty of the jury to find accordingly. This case was certainly not within that category.

The objection that the notice of rescission was void because given on Sunday is without force. It was given at the mine, which is in Nevada. The result claimed could be produced only by a statutory provision to that effect. The statute of Nevada relating to the Sabbath in no wise affects the subject. See "An Act for the better observance of the Lord's day," of Nov. 1, 1861, 1 Compiled Laws of Nevada, p. 2, c. 3.

The stock certificate left at the Gold Bank for Langdon was never in his possession. The affirmance of this judgment will extinguish his claim to it, and Pence can reclaim it whenever he may choose to do so. Langdon was not bound to receive it and tender it back to Pence before bringing suit.

The remaining exceptions relate to instructions given to the jury, which are as follows: —

"1. In deciding this question of fact, you must take the letters and telegrams and all of them, and looking at them in the light of the previous relations of the parties, and of what each of the writers knew, placing yourselves in the writers' place and situation in order better to ascertain their meaning and purpose, and in the light shed upon this question of fact by these letters and telegrams, and by the history of the whole transaction, you must determine whether the defendant did undertake to act as the plaintiff's agent for the purchase of the stock from others."

Admitting that the court was wrong in not giving a construction to the letters one way or the other, touching the main point in the controversy, as is insisted, a concession, perhaps, not necessary to be made, it cannot avail the plaintiff in error that it was not done. Properly construed, we think the letters show clearly the agency of Pence as claimed by Langdon. The jury found accordingly. No harm was, therefore, done by the omission of the court; and if it were erroneous, the error is one of which Pence certainly has no right to complain. With respect to the duty of the court as to construing the let-

ters, see *Etting* v. *The Bank of the United States*, 11 Wheat. 59; *Barreda* v. *Silsbee*, 21 How. 146.

" 2. It was not enough to charge the plaintiff with knowledge of the mal-character of the transaction, that the language used. was such as might have caused some persons to suspect it. He might, in view of previous friendly relations, have no suspicion of bad faith, and might naturally regard expressions as inaccurately used, rather than put upon them a construction which would show bad faith on the part of the defendant, which he had no reason to anticipate."

This, under the circumstances, we think, was exactly right.

" 3. Before the plaintiff was required to affirm or rescind the contract, he must be shown to have had actual knowledge of the imposition practised upon him. It is not enough to show that he might have known or suspected it from data within his reach."

The preceding remark is applicable also to this instruction.

" 4. If the jury believe that the plaintiff had no actual knowledge or belief that defendant had put his own stock upon them, until June, 1875, at the mine, then his repudiation of the transaction, if made then, was sufficient."

There can be no doubt as to the soundness of this proposition.

Acquiescence and waiver are always questions of fact. There can be neither without knowledge. The terms import this foundation for such action. One cannot waive or acquiesce in a wrong while ignorant that it has been committed. Current suspicion and rumor are not enough. There must be knowledge of facts which will enable the party to take effectual action. Nothing short of this will do. But he may not wilfully shut his eyes to what he might readily and ought to have known. When fully advised, he must decide and act with reasonable despatch. He cannot rest until the rights of third persons are involved and the situation of the wrong-doer is materially changed. Under such circumstances he loses the right to rescind, and must seek compensation in damages. But the wrong-doer cannot make extreme vigilance and promptitude conditions of rescission. It does not lie in his mouth to complain of delay unaccompanied by acts of ownership, and by

which he has not been affected. . The election to rescind or not to rescind, once made, is final and conclusive.

The burden of proving knowledge of the fraud and the time of its discovery rests upon the defendant.

Here Langdon was lulled into security by his relations to Pence, and by Pence's letters.

There is no proof that he had the slightest knowledge or even suspicion of any foul play until he visited the mine. His action then was prompt and decided.

The instructions of the court as to the law upon the subject were clear, accurate, and well expressed. The rest was for the jury. With what they did we have nothing to do.

We find no error in the record.

*Judgment affirmed.*